IN RE PETITION FOR REINSTATEMENT OF THE LICENSE OF HARVEY J. NAVRKAL, M.D., TO PRACTICE MEDICINE AND SURGERY.

HARVEY J. NAVRKAL, M.D., APPELLEE, v. STATE OF NEBRASKA ON BEHALF OF THE NEBRASKA DEPARTMENT OF HEALTH AND HUMAN SERVICES REGULATION AND LICENSURE AND THE NEBRASKA CHIEF MEDICAL OFFICER, APPELLANT.

703 N.W.2d 247

Filed September 9, 2005.    No. S-04-808.

Jon Bruning, Attorney General, and James D. Smith for appellant.

Charles M. Pallesen, Jr., of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

Harvey J. Navrkal, M.D., seeks reinstatement of his license to practice medicine and surgery, which was revoked in 1997. The State of Nebraska on behalf of the Department of Health and Human Services Regulation and Licensure and the Nebraska chief medical officer appeals the decision of the district court for Lancaster County, which ordered that Navrkal's license be reinstated. We reverse, and remand with directions.

## BACKGROUND

### EARLY 1990's

Navrkal graduated from the University of Nebraska Medical Center in 1990. Following his graduation, he entered a family practice residency program in Lincoln, Nebraska. He was suspended from that program in July 1991 to undergo treatment for alcohol dependency and was reinstated in September upon completing his treatment. One month later, he suffered a relapse and resigned from the program.

Navrkal went on to become a licensed physician in Colorado in April 1994. Because of his past issues with alcohol and depression, his Colorado license was subject to a 5-year probationary term and numerous terms and conditions designed to address his alcohol problems. Just 2 months after Navrkal received the license, it was suspended. The Colorado Board of Medical Examiners suspended the license because Navrkal had been suspended from his residency program in Colorado for

"significant attendance lapses and marginal performance" and also for missing two urine tests required under the terms of his license. His Colorado license is still suspended today.

### NEBRASKA LICENSURE AND REVOCATION

Navrkal applied for a medical license in Nebraska in 1996. In letters to the then Nebraska Department of Health Professional and Occupational Licensure Division, Navrkal informed it that he had successfully completed a treatment program for alcoholism and had been sober for 2 years. He also wrote that he took full responsibility for his past lapses and was agreeable to any reasonable stipulations on his license. His application was also supported by several letters of recommendation.

On April 4, 1996, the Nebraska Board of Examiners in Medicine and Surgery (board) granted a license to Navrkal subject to a 5-year probationary period. Among the terms and conditions attached to his license, Navrkal was required to abstain from the consumption of alcohol and submit a practice plan for approval by the board. The board subsequently approved a practice plan that permitted Navrkal to practice at the Douglas County Hospital in Omaha, Nebraska.

Despite having been approved to practice medicine only at the Douglas County Hospital, Navrkal also began practicing occasionally at the Schuyler Memorial Hospital in Schuyler, Nebraska. Navrkal claimed that he erroneously thought he had been approved to practice in Schuyler. Navrkal "moonlighted" at the hospital in Schuyler without authorization for approximately 1 year.

While working at the Douglas County Hospital in early 1997, Navrkal met T.M., a female patient in the hospital's psychiatric ward. The details of Navrkal's relationship with T.M. were set forth in the State of Nebraska's petition to revoke Navrkal's license. Navrkal did not contest any of the following allegations from that petition:

> 22. Patient TM is a 27 year old female with a ninth grade education who was admitted to the Douglas County Hospital on January 11, 1997, for major depression with suicidal ideation and panic disorder. She was also treated at the Douglas County Hospital for drug and alcohol

dependency prior to her discharge to the Hastings Regional Center on February 7, 1997 for another month of chemical dependency treatment.

23. [Navrkal's] responsibilities for treating Patient TM at the Douglas County Hospital included screening and assessing her medical condition, collaborating with the Advanced Registered Nurse Practitioner who also treated Patient TM's medical condition, and medical follow-up as needed or indicated for Patient TM.

24. [Navrkal] was notified of Patient TM's admission to Douglas County Hospital on the afternoon of January 11, 1997. [Navrkal] directed that Patient TM's initial medical history and physical be performed by the Advanced Registered Nurse Practitioner for whom [Navrkal] was the designated collaborating physician.

25. [Navrkal] made and/or annotated treatment orders for Patient TM on at least five occasions while she was a patient in the Douglas County Hospital. The five occasions included [Navrkal's] documentation of the following matters on "Physician's Order/Progress Notes" of Patient TM's medical records: Patient TM's history of abnormal PAP smears, scheduling for pelvic and PAP smear in the hospital's clinic for which [Navrkal] was the Medical Director, prescribing medications on separate occasions, examining Patient TM after her complaint of lower left quadrant pain, discussing results of PAP smear, and treating Patient TM's complaint of sinus congestion.

26. [Navrkal] regularly visited and communicated with Patient TM while she was a patient at Douglas County Hospital.

27. Several of the nursing and professional staff at Douglas County Hospital warned [Navrkal] against having personal involvement with patients in the psychiatric unit, specifically including Patient TM after observing [Navrkal's] interactions with Patient TM. [Navrkal] ignored the warnings.

28. Patient TM was transferred directly from the Douglas County Hospital to the Hastings Regional Center on February 8, 1997.

29. Patient TM was a patient in the Hastings Regional Center from February 8, 1997, through March 7, 1997, when she was discharged.

30. During the time Patient TM was a patient in the Hastings Regional Center, [Navrkal] regularly phoned Patient TM.

31. During the time Patient TM was a patient in the Hastings Regional Center, [Navrkal] sent her flowers.

32. During the time Patient TM was a patient in the Hastings Regional Center, [Navrkal] engaged in written correspondence of a romantic nature with Patient TM.

. . . .

35. Patient TM responded by sending numerous letters to [Navrkal]. The letters became more sexually explicit as time moved toward her anticipated discharge from the Hastings Regional Center, including references to a rendezvous with [Navrkal] upon Patient TM's discharge.

36. On March 7, 1997, Patient TM was discharged from the Hastings Regional Center.

37. On March 7, 1997, [Navrkal] picked Patient TM up at a prearranged meeting location.

38. After picking up Patient TM, [Navrkal] drove straight to a motel in Schuyler, Nebraska.

39. [Navrkal] registered and paid for a motel room for two people in his name. [Navrkal] and Patient TM stayed at the motel the entire weekend of March 7 through 10, 1997.

. . . .

41. [Navrkal] and Patient TM had sexual relations in the motel at various times during the weekend.

42. [Navrkal] also worked as a physician and was on call at the Schuyler Memorial Hospital the same weekend.

43. When Patient TM was discharged from the Hastings Regional Center, her discharge treatment recommendations included the recommendation that she contact a specific psychiatrist who had treated Patient TM at the Douglas County Hospital.

44. After Patient TM's discharge from the Douglas County Hospital [sic], Patient TM told [Navrkal] of Patient TM's desire to pursue out-patient treatment with

the psychiatrist at the Douglas County Hospital. [Navrkal] told Patient TM that she couldn't see this particular psychiatrist for aftercare because of [Navrkal's] sexual relationship with Patient TM and [Navrkal's] employment at the Douglas County Hospital. [Navrkal] advised Patient TM to go elsewhere for out-patient treatment.

45. The psychiatrist at Douglas County Hospital subsequently had to advise Patient TM, when she contacted him for treatment, that he could not treat her because of Patient TM's personal involvement with [Navrkal], who was an employee of the same hospital. The psychiatrist referred her to another hospital for out-patient treatment.

46. On April 15, 1997, [Navrkal] was placed upon a leave of absence, pending further investigation, by the Douglas County Hospital when supervisory staff became aware of [Navrkal's] correspondence with Patient TM.

47. The day [Navrkal] was placed on a leave of absence, he called Patient TM. While the son of a cardiologist was listening in on the phone conversation, with the consent of Patient TM, [Navrkal] made comments such as the following to Patient TM:

"You can't tell anyone that we had relations - promise me! Can you promise me?"

"You have to tell them that we had no relations, you have to tell them that you were unstable and that I kept asking you to quit sending them, you have to tell them that or I will lose my license and that can't happen."

"We need to get our stories straight."

48. Douglas County Hospital, at all times relevant herein, had a written hospital policy that stated, in part, as follows:

"Personnel will not be personally involved with any patient during the patient's hospitalization . . . at Douglas County Hospital and for a period of 6 months following discharge, unless the relationship existed prior to hospitalization/residency or is part of the patient's written care plan."

[Navrkal] would have been made aware of the policy during his orientation as a hospital employee in 1996.

49. On or about April 24, 1997, [Navrkal] resigned his position with Douglas County Hospital.

50. At approximately the same time [Navrkal] resigned his position, he went to the trailer where Patient TM was residing and entered the trailer without being invited. While Patient TM was hiding in a closet, [Navrkal] went through drawers and other areas of the trailer. Two witnesses, in addition to Patient TM, caught [Navrkal] in the act of searching Patient TM's trailer.

51. [Navrkal] was observed consuming beer, by persons other than Patient TM, from March through April, 1997.

52. Patient TM, upon discharge from chemical dependency treatment at the Hastings Regional Center, was also taken by [Navrkal] to bars in the town of Schuyler, Nebraska during the same weekend of March 7-10, 1997. Patient TM observed [Navrkal] drinking beer.

53. [Navrkal] has been interviewed by an investigator for the Department of Health and Human Services Regulation and Licensure concerning the above events.

54. [Navrkal] has admitted to the investigator that he sent the previously alleged written correspondence to Patient TM while she was a patient in the Hastings Regional Center, that he sent her [a] stuffed animal, that he called her, that he picked her up, and that they stayed in the same motel room in Schuyler on the weekend of March 7-10, 1997. However, [Navrkal] denied having any sexual relations with Patient TM and explained that he and Patient TM had just been good friends.

55. [Navrkal] lied to the Department's investigator when he denied having sexual relations with Patient TM.

As mentioned, the State filed a petition for disciplinary action against Navrkal on June 27, 1997. The petition sought to revoke Navrkal's medical license because of his relationship with T.M., his consumption of alcohol in violation of the terms of his probationary license, and his practicing medicine in Schuyler without approval. On October 17, 1997, the chief medical officer approved an agreement between Navrkal and the State that resulted in the revocation of his license. Under the terms of the revocation, Navrkal could not seek reinstatement of his license for 2 years. The terms of the revocation also stated that "any future reinstatement of [Navrkal's] license is

completely discretionary and that he has received no promises or assurances that his license will be reinstated."

Navrkal was 34 years old in 1997.

POSTREVOCATION

Although he was eligible to apply for reinstatement in 1999, Navrkal testified that he did not apply at that time because he "wasn't ready. I was still struggling with the depression and I'd had a relapse of alcohol abuse." That year, he was arrested in Texas for driving under the influence. During the stop, Navrkal refused to take a breath test when the arresting officer did not agree to release him if such a test "was negative." Navrkal eventually pled no contest to a charge of reckless driving, for which he was placed on 1 year's probation, received a suspended sentence of 30 days' imprisonment, was fined $200, and was ordered to complete 100 hours of community service.

Navrkal earned a juris doctor degree from the University of Texas School of Law in 2000 and a master of laws degree from the University of Houston Law Center in 2002. Since 1997, he has earned 324 credit hours of continuing medical education and has authored more than a dozen papers and presentations concerning medical legal issues. At the time of the hearing before the board in this case, Navrkal was employed with Medical Law Associates, where he participated in medical case reviews involving medical legal issues. He had applied to take the Texas bar examination in July 2003, his second attempt at passing the examination. Navrkal was also nearing completion of his thesis for a master's degree in public health at the University of Texas Health Science Center. Navrkal was engaged to be married in October 2003.

Since 1997, Navrkal has addressed his alcohol and depression issues in several ways. He began seeing a psychiatrist and a psychologist. The record contains a letter from Dr. Edgar Nace, a psychiatrist Navrkal met regularly with from October 1997 to September 1998. Nace met Navrkal again in February 2003 to review Navrkal's progress over the prior few years. Nace had the following to say about Navrkal:

> Dr. Navrkal has entered into a sustained period of recovery from alcohol dependence. This is documented through the Travis County Medical Society Physician's Health

Program as well as through his educational and work record since he moved to Texas. He remains committed to 12-Step programs and carries a very good prognosis.

Dr. Navrkal also has shown full understanding of the error he made years ago regarding an intimate relationship with a patient. This was clearly an alcohol abuse related incident. This was a one-time occurrence in Dr. Navrkal's career and there is no reason to expect that this behavior would be repeated. This issue has been dealt with in Dr. Navrkal's therapy with me. . . . Further, Dr. Navrkal has experienced considerable remorse and regret over this issue of judgment which occurred early in his career. I have many years of experience treating physicians with addictive and exploitive behaviors through my role as committee member of [the] Texas Medical Association Physician Health Committee. Dr. Navrkal does not fit a profile of physicians who are likely to engage in repetitive exploitive behaviors.

There is no reason why Dr. Navrkal could not return to the practice of medicine. He is committed to fulfilling his ambition to be a primary care physician in spite of the fact that he has demonstrated considerable accomplishments in other academic areas.

Navrkal has also participated in a monitoring program and a voluntary drug screening program through the Texas Medical Association. At the time of the hearing before the board, Navrkal had been sober for 3 years, 9 months. He has been actively involved in International Doctors of Alcoholics Anonymous meetings. In addition to the letter from Nace, Navrkal's application was accompanied by numerous letters of recommendation from doctors, lawyers, the pastor of his church, and others he has worked with.

At the time of the board hearing, Navrkal had been accepted into two residency programs: one at the University of Massachusetts and the other at Louisiana State University. His participation in either program was subject to having his Nebraska license reinstated. Navrkal testified that if his Nebraska license were to be reinstated, he would "probably" move to Massachusetts or Louisiana and enter into one of those

two programs. Navrkal testified that physicians' health rehabilitation committees in Massachusetts and Louisiana had indicated their willingness to work with and support Navrkal should he relocate to either of those states.

### REINSTATEMENT PROCEEDINGS

On November 6, 2002, Navrkal filed a petition for reinstatement of his medical license. A hearing was held before the board on June 6, 2003. During the hearing, evidence was received that established the facts recited above. While testifying, Navrkal repeatedly said that he took full responsibility for his past actions. In a written personal statement, Navrkal wrote:

> Since leaving Nebraska, there has not been a single day go by where I have not felt regret for the immaturity, irresponsibility, un-professionalism and inappropriate behavior I exhibited in the past. Though in large part due to alcohol abuse, I do not wish to use that as an excuse now.
>
> . . . .
>
> My primary desire has always been that of a doctor. Not any physician, but one whom is held in high esteem by the profession and the community. With all my experiences, both the negative and positive experiences, I feel I have a lot to add to the profession. I worked hard to achieve my medical education. I hope and pray the Nebraska Medical Board will work with me to achieve my primary desire.

The board recommended, by a unanimous vote, to reinstate Navrkal's license with numerous terms, conditions, and restrictions. The board forwarded its recommendation to the chief medical officer. The chief medical officer rejected the recommendation of the board and denied reinstatement of Navrkal's license. The chief medical officer stated:

> The record and evidence presented at the hearing shows Dr. Navrkal's failure to take advantage of the multiple opportunities given him; shows an insufficient commitment, effort and sustained attempts on the part of Dr. Navrkal to reform his behavior; and inadequate evidence of sustained sobriety to afford the public the protection to which it is entitled, and to justify the trust that Nebraska licensure entails.

. . . The recommendations of the Board are inadequate to appropriately monitor the licensee in order to afford the public protection, particularly if Dr. Navrkal will be absent from this state.

Navrkal filed a petition for review of the chief medical officer's decision in the district court pursuant to the Administrative Procedure Act (APA). The court reversed the chief medical officer's decision and ordered that Navrkal's license be reinstated. The court reached that conclusion after first determining that Navrkal had the burden of proving by the preponderance of evidence that his license should be reinstated. The court then found that Navrkal had proved, not merely by a preponderance but by clear and convincing evidence, that his license should be reinstated. The State filed this timely appeal, and we granted its petition to bypass the Nebraska Court of Appeals.

## ASSIGNMENTS OF ERROR

The State assigns that the district court erred in (1) concluding that a medical license is to be reinstated after discipline revocation when the applicant satisfies a burden of proof evidentiary standard; (2) failing to clearly or accurately determine the elements of proof which must be established for reinstatement; (3) concluding that if an applicant must satisfy an evidentiary standard, the applicable standard is preponderance of the evidence; (4) disregarding the chief medical officer's finding and conclusion that the board's probation requirements were inadequate to monitor Navrkal; (5) finding that Navrkal had an alcohol relapse when he was arrested for driving under the influence in 1997, rather than 1999, and had no law enforcement contacts after 1997; and (6) reversing the chief medical officer's decision.

## STANDARD OF REVIEW

A judgment or final order rendered by a district court in a judicial review pursuant to the APA may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Lein v. Nesbitt*, 269 Neb. 109, 690 N.W.2d 799 (2005). When reviewing an order of a district court under the APA for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is not arbitrary, capricious, or unreasonable. *Id.* Whether a

decision conforms to law is by definition a question of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court. *Id.* An appellate court, in reviewing a district court judgment for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Id.*

## ANALYSIS

Licenses to practice medicine and surgery are issued by the Nebraska Department of Health and Human Services Regulation and Licensure (hereinafter department) under the provisions of the Uniform Licensing Law, Neb. Rev. Stat. § 71-101 et seq. (Reissue 1996 & Cum. Supp. 2002). The Uniform Licensing Law provides for the disciplinary revocation of licenses, § 71-147, as well as the reinstatement of licenses previously revoked, § 71-161.04(2).

A petition for reinstatement is first considered by the board. § 71-161.06. The board makes a recommendation to the director of the department regarding reinstatement, § 71-161.07(1), although the duties of the director may be performed, as in this case, by the chief medical officer. See § 71-155.01 and Neb. Rev. Stat. § 81-3201(2) (Supp. 2003). Upon receiving an affirmative recommendation from the board, an applicant may apply to the director of the department for reinstatement. § 71-161.20(1).

> The director shall then review the application and other documents and *may* affirm the recommendation of the board and grant reinstatement or *may* reverse or modify the recommendation if the board's recommendation is (a) in excess of statutory authority, (b) made upon unlawful procedure, (c) unsupported by competent, material, and substantial evidence in view of the entire record, or (d) arbitrary or capricious.

(Emphasis supplied.) § 71-161.20(2).

■ Generally, the word "may," when used in a statute, will be given its ordinary, permissive, and discretionary meaning unless it would manifestly defeat the statutory objective. *Spaghetti Ltd. Partnership v. Wolfe*, 264 Neb. 365, 647 N.W.2d 615 (2002).

■ It is clear from a review of the applicable statutes that the director's or chief medical officer's decision to reinstate a license to practice medicine and surgery is a discretionary one; an applicant is not entitled to have his or her license reinstated as a matter of right upon satisfying any particular quantum of proof. See, also, *State v. Hinze*, 232 Neb. 550, 441 N.W.2d 593 (1989) (there exists no vested right to practice medicine; rather, it is conditional right subordinate to police power of State to protect and preserve public health). The parties recognized this in the 1997 agreement revoking Navrkal's license, which provided that "any future reinstatement of [Navrkal's] license is completely discretionary." Such discretion, however, is not boundless. As provided in § 71-161.20(2), the director may reverse or modify the recommendation of the board if the board's recommendation is (a) in excess of statutory authority; (b) made upon unlawful procedure; (c) unsupported by competent, material, and substantial evidence in view of the entire record; or (d) arbitrary or capricious.

A judgment or final order rendered by a district court in a judicial review pursuant to the APA may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Lein v. Nesbitt*, 269 Neb. 109, 690 N.W.2d 799 (2005). When reviewing an order of a district court under the APA for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is not arbitrary, capricious, or unreasonable. *Id.* The chief medical officer found that Navrkal "seeks reinstatement of his Nebraska license in order to allow his . . . return to practice outside of Nebraska." The chief medical officer determined that the recommendations of the Board were inadequate to afford the public protection by appropriately monitoring Navrkal if he was practicing outside the State of Nebraska. The district court, in reversing the chief medical officer's decision, "presume[d] that the jurisdiction to which Navrkal applies to practice will have its own acceptance guidelines for new applicant's [sic] to the medical community and will take into consideration Navrkal's prior disciplinary actions, when determining the terms and conditions of any license it grants Navrkal." There is no evidence in the

record to support such a presumption. Therefore, we find error on the record and reverse the district court's order.

## DISCRIMINATION CLAIM

■ Navrkal contends that denying reinstatement of his license to practice medicine would amount to illegal discrimination under title II of the Americans with Disabilities Act of 1990. He also raises a number of constitutional arguments with respect to the hearing before the board and other aspects of his petition for reinstatement. None of these arguments were included in his petition for review filed in the district court, and none were decided by the district court. Where a cause has been appealed to a higher appellate court from a district court exercising appellate jurisdiction, only issues properly presented to and passed upon by the district court may be raised on appeal to the higher court. In the absence of plain error, where an issue is raised for the first time in the higher appellate court, it will be disregarded inasmuch as the district court cannot commit error in resolving an issue never presented and submitted for disposition. *McQuinn v. Douglas Cty. Sch. Dist. No. 66*, 259 Neb. 720, 612 N.W.2d 198 (2000). Therefore, we decline to consider these arguments.

## CONCLUSION

We conclude that the decision of the chief medical officer, performing the acts of the director under § 71-155.01 in denying the reinstatement of a license to practice medicine and surgery, is a discretionary one and that an applicant is not entitled to have his or her license reinstated as a matter of right. We further conclude that the district court erred in reversing the decision of the chief medical officer denying reinstatement of Navrkal's license. Accordingly, we reverse the district court's order and remand the cause with directions to reinstate the order of the chief medical officer.

REVERSED AND REMANDED WITH DIRECTIONS.

WRIGHT, J., not participating.